UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    |
ANNA PEARCE, professionally known   |
as Patty Duke,                      |
                                    |
              Plaintiff,            |
                                    |      06 Civ. 1535 (KMW)
      -against-                     |
                                    |      OPINION AND ORDER
MANHATTAN ENSEMBLE THEATER, INC.,   |
GOLDA TOUR I, L.P., DAVID FISHELSON,|
and FISHELSON PRODUCTIONS, INC.,    |
                                    |
              Defendants.           |
                                    |
------------------------------------X
KIMBA M. WOOD, U.S.D.J.:

     Defendants Manhattan Ensemble Theater, Inc., Golda Tour I,

L.P., David Fishelson, and Fishelson Productions, Inc. move to

dismiss this action by Plaintiff Anna Pearce, for failure to

state a claim on which relief may be granted.  Fed. R. Civ. P.

12(b)(6).  In this action, Plaintiff alleges (1) breach of

contract; (2) breach of the implied covenant of good faith and

fair dealing; (3) promissory estoppel; (4) invasion of privacy,

pursuant to Section 51 of the New York Civil Rights Law; (5)

unjust enrichment; and (6) employment discrimination, pursuant to

the New York City and State Human Rights Laws.  For the reasons

stated below, Defendants' motion is granted in part and denied in

part.

**BACKGROUND**

The following facts, drawn from the Complaint except where noted, must be accepted as true for purposes of this motion to dismiss.  See Kirch v. Liberty Media Corp., 449 F.3d 388, 392 (2d Cir. 2006).

Plaintiff Anna Pearce, known professionally as Patty Duke, is a citizen of Idaho.  (Compl. ¶ 1.)  Defendant David Fishelson is a citizen of New York.  (Id. ¶ 4.)  Defendants Manhattan Ensemble Theater, Inc., Golda Tour I, L.P., and Fishelson Productions, Inc. are, respectively, a nonprofit corporation, a limited partnership, and a business corporation organized under New York law and doing business in New York.  (Id. ¶¶ 2-3, 5.)

Plaintiff is a celebrated film, television, and stage actress, best known for her starring roles in The Miracle Worker and The Patty Duke Show.  (Id. ¶ 9.)  In October 2004, Defendants proposed to Plaintiff's agent, Mitchell K. Stubbs, that Plaintiff consider accepting the role of Israeli prime minister Golda Meir in William Gibson's play Golda's Balcony, on the national tour.  (Id. ¶¶ 11-12.)  Defendants told Stubbs that Plaintiff's reunion with playwright Gibson, the author of The Miracle Worker, would be a "fun AND meaningful" marketing hook that could prove highly profitable.  (Id. ¶¶ 13-14.)  Plaintiff later told Stubbs that she approved of the script.  (Id. ¶ 16.)  Stubbs then began negotiations with Defendants on Plaintiff's behalf.  (Id.)

Meanwhile, Plaintiff underwent heart bypass surgery in November 2004.  (Id. ¶ 17.)

Plaintiff contends that sometime after December 8, 2004, Stubbs and Defendants reached an agreement that Plaintiff would perform the role of Golda Meir.  (Id. ¶¶ 22-23.)[1]  Specifically, Stubbs and Defendants agreed that (1) Plaintiff would perform as Golda Meir from in or about September 2005 to on or about May 31, 2006; (2) Plaintiff would accept no other entertainment engagements during that time; (3) Defendants would pay Plaintiff $25,000 for each week of performances, and the guaranteed Actors' Equity rate for each week of rehearsals, but no less than fifteen weeks of full salary even if the show closed; (4) Plaintiff would receive 10% of all weekly ticket sales over $150,000 and 15% of all weekly sales over $175,000; and (5) Defendants would compensate Plaintiff for any losses suffered in the event Defendants breached the agreement.  (Id. ¶ 23.)  Defendants then requested and were given Plaintiff's contact information.  (Id. ¶ 25.)  Stubbs believed that the exchange of contact information confirmed that the agreement was a binding contract, because of Stubbs's standing policy that "industry people" be allowed to

---

[1] Defendants do not agree that they reached a contract with Plaintiff on the terms described in this paragraph.  Rather, as discussed in the next section, they contend that while Defendants emailed Stubbs a draft agreement that contained these terms, the draft was only a proposal.  As explained below, the Court may not consider the draft email at this stage, and Plaintiff's version must be accepted as true.

contact Plaintiff directly only after agreeing on the terms and
conditions of Plaintiff's engagement.  (<u>Id.</u> ¶ 10.)  Defendant
Fishelson spoke directly to Plaintiff on January 5, 2005, and met
with her in New York on January 20, 2005.  (<u>Id.</u> ¶ 25.)
Thereafter, Defendants distributed press releases and advertising
materials announcing Plaintiff's casting and her reunion with
Gibson, materials that helped Defendants secure theaters and
ticket sales for <u>Golda's Balcony</u>.  (<u>Id.</u> ¶¶ 26-28.)  Plaintiff
began to learn her lines and forgo other career opportunities.
(<u>Id.</u> ¶ 29.)

At their January 20 meeting, Plaintiff told Defendant
Fishelson that she had been unable to complete the filming of a
television program earlier that month.  (<u>Id.</u> ¶ 30.)  This
conversation led Defendants to believe, incorrectly, that
Plaintiff's heart surgery had disabled her.  (<u>Id.</u> ¶ 32.)  On
March 7, 2005, Defendants instructed their attorney to "divest"
themselves of Plaintiff.  (<u>Id.</u> ¶ 31.)  Thereafter, Defendants
cast another actress, Valerie Harper, as Golda Meir, yet
continued to use Plaintiff's name and likeness to advertise the
production.  (<u>Id.</u> ¶ 33.)

## **STANDARD OF REVIEW**

Defendants may move to dismiss a claim under Federal Rule of
Civil Procedure 12(b)(6) for failure to state a claim on which

relief can be granted.  In weighing a motion to dismiss, the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor." Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006).  "A complaint may not be dismissed under the Rule unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts" entitling her to relief.  Id. at 250 (internal quotation marks omitted).

As a threshold matter, in deciding the motion to dismiss, the Court may not consider an unsigned draft agreement emailed to Stubbs, Plaintiff's agent, during the course of negotiations (see Neier Affirmation, Ex. B), because it is not annexed to or referenced in the Complaint, and because Plaintiff did not rely on it in drafting the Complaint.  On a motion to dismiss, a court may consider a document other than an exhibit to a complaint only if it is one on which the plaintiff "solely relies and which is integral to the complaint."  Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).  The Second Circuit has emphasized that "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion."  Chambers v. Time Warner, Inc., 282 F.3d 147,

153 (2d Cir. 2002) (emphasis in original).[2]  By the Second
Circuit's standards, Plaintiff did not rely on the draft
agreement in preparing the Complaint: The Complaint makes no
reference to the draft agreement, Plaintiff did not sign the
draft agreement, and the parties disagree about whether and how
the draft agreement relates to their relationship.  Accordingly,
the Court cannot consider the draft agreement in deciding this
motion.[3]

## DISCUSSION

### I.    Breach of Contract

Defendants first argue that Plaintiff cannot sustain a claim
for breach of contract because no enforceable contract existed.
Plaintiff concedes that there was no written agreement between

---

[2] The Chambers court affirmed the district court's decision to
consider written contracts between plaintiffs and defendants, because
"[t]he Amended Complaint is replete with references to the contracts
and requests judicial interpretation of their terms."  Id. at 153 n.4.
By contrast, it disapproved the district court's decision to consider
certain unsigned codes setting forth standard minimum terms for
contracts with members of plaintiffs' union, because "[t]he Amended
Complaint does not refer to the Codes, plaintiffs apparently did not
rely on them in drafting it, and none of the Codes submitted to the
court were signed by the [defendants]," and because "the parties
disagree as to whether and how the Codes relate to or affect the
contractual relationships at issue."  Id. at 154.  The court added
that "[c]ourts have declined to consider unsigned documents in ruling
on motions to dismiss."  Id. at 154 n.5 (citing cases).

[3] Conversion to summary judgment would also be inappropriate
because discovery has not yet occurred.  See Gurary v. Winehouse, 190
F.3d 37, 43 (2d Cir. 1999) ("[P]arties are entitled to a reasonable
opportunity to present material pertinent to a summary judgment
motion.").

the parties, but she alleges that the parties had an oral agreement that is enforceable under New York law.[4]  "[U]nder New York law, oral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing."  Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 109 (2d Cir. 2003).  Factors to which courts look in evaluating the parties' intent to be bound include (1) any explicit statement that only a writing shall be binding; (2) partial performance; (3) complete negotiation of all terms; and (4) whether the subject matter of the contract is one that normally requires a written agreement.  R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75-76 (2d Cir. 1984); see also Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 575-76 (2d Cir. 1993) (listing variety of additional factors that may be considered).  The Complaint alleges that "the parties reached an agreement" with definite terms and conditions (Compl. ¶¶ 23, 25), and that Plaintiff "spent a substantial amount of time learning her lines and otherwise preparing for her role" and "forewent other career opportunities" (id. ¶ 29).[5]  These allegations,

---

[4] Plaintiff did not specify the form of the agreement in the Complaint (see Compl. ¶ 23); her memorandum of law, however, describes the agreement as oral (see Pl.'s Mem. of Law in Opp'n 8.).

[5] Although Defendants argue at length that the draft agreement -- which contains a merger clause (see Neier Affirmation, Ex. B, ¶ 19) -- expresses the parties' intent not to be bound by an oral agreement, the Court cannot consider the draft agreement and accompanying email message at this stage, as explained above.

taken as true, could satisfy the factors described by the Second Circuit in Horn & Hardart.

Defendants also contend that even if an oral contract existed, it is unenforceable because of the Statute of Frauds, which invalidates any unwritten agreement incapable of performance within one year.[6]  They note that the Complaint alleges that the agreement was made "[i]n the days and weeks" following December 2004, but that the tour was not to conclude until May 2006.  (Compl. ¶ 23.)

New York courts interpret the Statute of Frauds narrowly. D & N Boening, Inc. v. Kirsch Beverages, Inc., 472 N.E.2d 992, 993-94 (N.Y. 1984).  The Court of Appeals has stated that the Statute "encompass[es] only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year. . . . however unexpected, unlikely, or even improbable that such performance will occur during that time frame." Cron v. Hargro Fabrics, Inc., 694 N.E.2d 56, 58 (N.Y. 1998) (citations and internal quotation marks omitted).  In particular, an agreement does not fall afoul of the Statute of Frauds if it contains an express option to terminate within one

---

[6] The Statute of Frauds provides, in relevant part: "Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [b]y its terms is not to be performed within one year from the making thereof . . . ."  N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2007).

year, because rightful termination is one means of completing performance.  North Shore Bottling Co. v. C. Schmidt & Sons, Inc., 239 N.E.2d 189, 191 (N.Y. 1968).  By contrast, "[a] contract is not 'to be performed within a year' if it is terminable within that time only upon the breach of one of the parties."  Ohanian v. Avis Rent A Car Sys., Inc., 779 F.2d 101, 107 (2d Cir. 1985).

Plaintiff has alleged that the parties agreed she would receive "no fewer than fifteen (15) weeks of full salary (even if the show closed)."  (Compl. ¶ 23.)  Given this allegation, Plaintiff may be able to prove that the parties contemplated termination and agreed that Defendants would have the right to terminate the arrangement even before the fifteen-week mark, in which case Plaintiff would receive no less than fifteen weeks' salary.  Such an express provision, if proven, would remove the agreement from the ambit of the Statute of Frauds.  The Complaint thus may not be dismissed for failure to satisfy the Statute.

## II.   **Breach of the Covenant of Good Faith and Fair Dealing**

Defendants argue that the second count of the Complaint, alleging a breach of the implied covenant of good faith and fair dealing, should be dismissed as duplicative of the breach-of-contract count.

Under New York law, all contracts contain an implied

covenant of good faith and fair dealing in the course of contract performance. Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995). The covenant encompasses "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" Rowe v. Great Atl. & Pac. Tea Co., 385 N.E.2d 566, 569 (N.Y. 1978) (quoting 5 Williston, Contracts § 1293, at 3682 (rev. ed. 1937)). However, breach of the implied covenant of good faith "'is merely a breach of the underlying contract,'" Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) (quoting Geler v. Nat'l Westminster Bank USA, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)), meaning as a matter of law that allegations of the breach of the implied covenant are irrelevant to recovery unless they are based on conduct different from the conduct that constitutes the alleged breach of contract, Geler, 770 F. Supp. at 215. In other words, "such a claim may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." Sauer v. Xerox Corp., 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000).

Plaintiff's allegations of breach of the implied covenant of good faith and fair dealing are not based on conduct different from the conduct that constitutes the alleged breach of contract. The Complaint alleges that Defendants breached the implied

covenant of good faith and fair dealing "by failing and refusing to honor their agreement that Ms. Pearce would play the role of Golda and by failing and refusing to compensate Ms. Pearce for the work that she did and according to their promises."  (Compl. ¶ 43.)  These promises to cast and compensate Plaintiff were also allegedly terms of the parties' oral contract (id. ¶ 23), and any violation of these promises would constitute breach of contract as well.[7]  The second count of the Complaint is duplicative and is therefore dismissed.

### III. **Promissory Estoppel**

Defendants raise two objections to the third count of the Complaint, which claims promissory estoppel.

First, Defendants argue that Plaintiff has not alleged the basic elements of promissory estoppel.  In New York, promissory estoppel has three elements: (1) an unambiguous promise; (2) reasonable and foreseeable reliance on the promise; and (3) injury as a result of the reliance.  Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).  The Complaint alleges that the parties

---

[7] Plaintiff's citation of Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989), is inapposite.  The alleged breach of good faith in Leberman concerned the disingenuous interpretation of an ambiguous contract provision, not an outright breach of the contract, as here.

had an unambiguous agreement[8] (Compl. ¶ 23), that Plaintiff relied on the promise in learning her lines and forgoing other career opportunities (id. ¶ 29), and that she has been financially and emotionally harmed by her reliance (id. ¶¶ 29, 37). Plaintiff has thus alleged the elements of promissory estoppel.

Second, Defendants take the position that the promissory estoppel claim should be dismissed because Plaintiff did not allege an "unconscionable" injury from her reliance. New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the Statute of Frauds. See Philo Smith & Co. v. USLIFE Corp., 554 F.2d 34, 36 (2d Cir. 1977) (requiring unconscionable injury lest "[t]he strongly held public policy reflected in New York's Statute of Frauds . . . be severely undermined"); see also Cunnison v. Richardson Greenshields Sec., Inc., 485 N.Y.S.2d 272, 275 (App. Div. 1985); D & N Boening, Inc. v. Kirsch Beverages, Inc., 471 N.Y.S.2d 299, 302 (App. Div. 1984). But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise. See Eber-NDC, LLC v. Star Indus., Inc., No. 2005-07137, 2006 WL

_____

[8] As explained above, Defendants' contention that the parties did not have an unambiguous agreement relies impermissibly on documents extrinsic to the Complaint.

2944669, at *2 (N.Y. Sup. Ct. Aug. 8, 2006) (explaining that unconscionability is not an element of this variety of promissory estoppel claim, and citing cases); see also Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995) (citing cases).  Because Plaintiff's promissory estoppel claim is of the latter type, unconscionability is not a required element.

IV.  **Invasion of Privacy**

The fourth count of the Complaint alleges that Defendants' unauthorized use of Plaintiff's name and image in advertising and press materials after deciding not to cast her in the production constitutes invasion of privacy, in violation of Section 51 of the New York Civil Rights Law.[9]

Defendants first argue that the invasion-of-privacy claim is time barred under the applicable one-year statute of limitations. See N.Y. C.P.L.R. § 215(3) (McKinney 2007).  The Complaint states that Defendants circulated the allegedly offending press materials "[i]n the days that followed" January 20, 2005 (Compl.

---

[9] Section 51 of the Civil Rights Law provides, in relevant part:
     Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use . . . .
N.Y. Civ. Rights Law § 51 (McKinney 2007).

¶ 26), but before Plaintiff's termination on March 7, 2005 (id. ¶ 31).  This action was filed on February 24, 2006.  It is possible that the allegedly unlawful uses of Plaintiff's name first occurred after February 24, 2005, in which case dismissal on this ground would not be warranted.  Plaintiff need not allege a specific publication date to survive a motion to dismiss, because Defendants, not Plaintiff, bear the burden of proof on the affirmative defense of the statute of limitations.  Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GmbH, 150 F. Supp. 2d 566, 572 (S.D.N.Y. 2001).

Next, Defendants claim that Plaintiff has failed to show that her name, likeness, or voice has been used in New York State.[10]  The Complaint alleges that the uses of Plaintiff's identity took place at least in part in New York State.  (Compl. ¶ 55.)  Defendants appear to contend that because Plaintiff's alleged engagement was for the "national" tour of Golda's Balcony, use in New York State is precluded.  (Defs.' Mem. of Law 20 (citing "obvious fact" that promotion "would have been directed at venues outside of New York").)  But Defendants offer no support for their assumption that a national tour would exclude New York.

Finally, Defendants contend that any press releases and

---

[10] Section 51 applies only when a plaintiff's name, likeness, or voice is "used within this state."  N.Y. Civ. Rights Law § 51 (McKinney 2007).

advertising containing Plaintiff's name and likeness are shielded by the "newsworthiness" exception to Section 51.  A plaintiff may not bring an invasion-of-privacy claim if the unauthorized use of her name, likeness, or voice was newsworthy.  Newsworthy uses include "not only descriptions of actual events but also articles concerning political happenings, social trends or any subject of public interest."  Messenger ex rel. Messenger v. Gruner + Jahr Printing & Publ'g, 727 N.E.2d 549, 552 (N.Y. 2000) (citations omitted).  A finding of newsworthiness depends on context: as the Court of Appeals has written, "While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information."  Gautier v. Pro-Football, Inc., 107 N.E.2d 485, 488 (N.Y. 1952).  Thus in Stephano v. News Group Publications, Inc., 474 N.E.2d 580 (N.Y. 1984), a photograph of the plaintiff modeling a bomber jacket was deemed newsworthy where it accompanied a New York magazine article on fashion, but the identical photo would not have been newsworthy if circulated by a clothier.  Compare, e.g., Finger v. Omni Publ'ns Int'l, Ltd., 566 N.E.2d 141 (N.Y. 1990) (photograph of adults and children newsworthy where used to illustrate magazine article), with Cohen v. Herbal Concepts, Inc., 472 N.E.2d 307 (N.Y. 1984) (photograph of mother and child not

newsworthy where used to promote cosmetic products).[11]

Defendants' press releases and advertisements do not fall within the newsworthiness exception.  The press releases and advertisements are said to have been newsworthy because they reported the "fun" and "meaningful" fact that Plaintiff's appearance in Golda's Balcony would have reunited her with playwright William Gibson, author of The Miracle Worker, in which Plaintiff starred in 1959.  (Defs.' Mem. of Law 21-22.)  But Defendants' purpose in preparing and disseminating materials with Plaintiff's name and likeness cannot be interpreted as reporting on a "social trend" or a "subject of public interest"; rather, the purpose was to entice prospective theater owners and ticket buyers.  Defendants' alleged activities were thus undertaken "for advertising purposes or for the purposes of trade," N.Y. Civ. Rights Law § 51 (McKinney 2007), and Plaintiff's invasion-of-privacy claim may not be dismissed pursuant to the newsworthiness

---

[11] Defendants cite Stephano for the proposition that "[i]t is the content of the article and not the defendant's motive or primary motive to increase circulation which determines whether it is a newsworthy item, as opposed to a trade usage." Stephano, 474 N.E.2d at 585.  This citation is misleading.  The Court of Appeals was discussing the irrelevance of a magazine's motivation to increase circulation by reporting on interesting and newsworthy topics, not the irrelevance of motivation generally.  See also Messenger, 727 N.E.2d at 552 (discussing motivation of "publication" to increase "circulation of a newsworthy article" (internal quotation marks omitted)).

exception.[12]

## V.  <u>Unjust Enrichment</u>

Count Five of the Complaint alleges that Defendants were unjustly enriched by their unauthorized use of Plaintiff's name and image.  Because New York does not recognize a common-law right of privacy, <u>Roberson v. Rochester Folding Box Co.</u>, 64 N.E. 442, 443 (N.Y. 1902), the exclusive remedy for nonconsensual commercial uses of a plaintiff's name and likeness is Sections 50 and 51 of the Civil Rights Law, <u>Messenger</u>, 727 N.E.2d at 551. Similarly, those sections provide the exclusive remedy for Plaintiff's unjust enrichment claim.  <u>See</u> <u>Myskina v. Condé Nast Publ'ns, Inc.</u>, 386 F. Supp. 2d 409, 420 (S.D.N.Y. 2005) ("Under New York law, common law unjust enrichment claims for unauthorized use of an image or likeness are subsumed by Sections 50 and 51."); <u>Zoll v. Jordache Enters., Inc.</u>, No. 01 Civ. 1339 (CSH), 2002 WL 31873461, at *16 (S.D.N.Y. Dec. 24, 2002) (same). Count Five is therefore dismissed.

---

[12] Because Defendants raise the issue of newsworthiness on a motion to dismiss, the invasion-of-privacy count may be dismissed only if there are no grounds on which Plaintiff might potentially prevail. After discovery, Defendants may again attempt to demonstrate that their specific uses of Plaintiff's name and likeness, if any, were newsworthy enough to fall outside the scope of Section 51.

VI.  **Employment Discrimination**

The final two counts of the Complaint allege that Defendants discriminated against Plaintiff on the basis of a perceived disability, in violation of the New York City Human Rights Law and the New York State Human Rights Law.[13]  Defendants move to dismiss these counts because Plaintiff is not a New York citizen and, Defendants contend, the alleged acts of discrimination did not take place in New York City or State.

A nonresident plaintiff may invoke the protection of the City and State Human Rights Laws only by proving that the discriminatory act or acts took place within the jurisdiction in question.  E.g., Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ. 2450 (LAP), 1999 WL 796172, at *16 (S.D.N.Y. Sept. 30, 1999) (city); Beckett v. Prudential Ins. Co. of Am., 893 F. Supp. 234, 238 (S.D.N.Y. 1995) (state).  In addition to requiring that the

---

[13] The New York City Human Rights Law provides, in relevant part:
        It shall be an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived . . . disability . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.
N.Y.C. Code § 8-107(1)(a).
        The New York State Human Rights Law provides, in relevant part: "It shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of the . . . disability . . . of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a) (McKinney 2007).  The term "disability" includes "a condition regarded by others as such an impairment."  Id. § 292(21)(c).

act have taken place within New York, courts interpreting the
City Human Rights Law have consistently required that the
discriminatory act or acts have had an <u>impact</u> in New York City.
<u>See</u> <u>Wahlstrom v. Metro-North Commuter R.R. Co.</u>, 89 F. Supp. 2d
506, 527 (S.D.N.Y. 2000) ("[T]he [City Human Rights Law] only
applies where the actual impact of the discriminatory conduct or
decision is felt within the five boroughs, even if a
discriminatory decision is made by an employer's New York City
office."); <u>Salvatore</u>, 1999 WL 796172, at *16; <u>Shah v. Wilco Sys.,</u>
<u>Inc.</u>, 806 N.Y.S.2d 553, 558 (App. Div. 2005).  For example,
several courts have dismissed claims under the City Human Rights
Law when the allegedly discriminatory decision to terminate the
employee was made at a corporation's New York City offices, but
the employee worked outside the city limits.  <u>See</u> <u>Lucas v.</u>
<u>Pathfinder's Pers., Inc.</u>, No. 01 Civ. 2252 (BSJ), 2002 WL 986641,
at *1 (S.D.N.Y. May 13, 2002); <u>Duffy v. Drake Beam Morin</u>, No. 96
Civ. 5606 (MBM), 1998 WL 252063, at *12 (S.D.N.Y. May 19, 1998);
<u>Lightfoot v. Union Carbide Corp.</u>, No. 92 Civ. 6411 (RPP), 1994 WL
184670, at *5 (S.D.N.Y. May 12, 1994).

But while courts in this District have uniformly held that
the City Human Rights Law requires plaintiffs to prove an impact
within the city, they do not agree on whether the State Human
Rights Law has an analogous "impact" requirement.  Some district
court opinions have required plaintiffs who sue for violations of

the State Human Rights Law to show that discriminatory decisions by defendants have had an impact in New York State.  See Lucas, 2002 WL 986641, at *2 (finding impact requirement in state law "[f]or essentially the same reason" as in city law); cf. Duffy, 1998 WL 252063, at *13 (holding that act within state is "insufficient to establish a violation" of State Human Rights Law).[14]  Other opinions, notably Torrico v. IBM Corp., 319 F. Supp. 2d 390 (S.D.N.Y. 2004), have declined to require proof of an impact in New York State, reasoning that while the City Human Rights Law includes an impact requirement, "no New York authority suggests that the [State Human Rights Law] is similarly limited." Torrico, 319 F. Supp. 2d at 399 n.5; see also Hart v. Dresdner Kleinwort Wasserstein Sec., LLC, No. 06 Civ. 0134 (DAB), 2006 WL 2356157, at *8 (S.D.N.Y. Aug. 9, 2006) (citing Torrico without further analysis); Tebbenhoff v. Elec. Data Sys. Corp., No. 02 CV 2932 (TPG), 2005 WL 3182952, at *5 (S.D.N.Y. Nov. 29, 2005) (same).

This Court agrees with the line of decisions that have found that the State Human Rights Law requires that there have been an

---

[14] Iwankow v. Mobil Corp., 541 N.Y.S.2d 428 (App. Div. 1989), cited by both Plaintiff and Defendants, is not on point.  The court in Iwankow dismissed the plaintiff's claim because, although he alleged that the decision to terminate him as "part of a world-wide reduction in force" was made at defendant's New York headquarters, he failed to allege that the decision to implement that reduction in a discriminatory fashion was made in New York.  Id. at 429.  The plaintiff therefore failed to meet the threshold "New York act" requirement, let alone the additional "New York impact" requirement.

impact in New York State.  Courts have traditionally read the
City and State Human Rights Laws in parallel.  See Dunson v.
Tri-Maintenance & Contractors, Inc., 171 F. Supp. 2d 103, 113-14
(E.D.N.Y. 2001) (citing cases); Mohamed v. Marriott Int'l, Inc.,
905 F. Supp. 141, 157 (S.D.N.Y. 1995) ("The wording of the city
ordinance and the manner in which it has been applied show a
clear intent to parallel the obligations and the remedies
provided by the State of New York . . . ."); see also Feingold v.
New York, 366 F.3d 138, 158 (2d Cir. 2004) (applying "same
standards of analysis" on aiding and abetting to City and State
Human Rights Laws because laws' language is "virtually identical"
(internal quotation marks omitted)).  If anything, the City Human
Rights Law "was intended to be more protective than the state
[law]."  Farrugia v. North Shore Univ. Hosp., 820 N.Y.S.2d 718,
724 (Sup. Ct. 2006) (emphasis added).  Given this background, the
fact that the City Human Rights Law requires plaintiffs to show
an impact within the jurisdiction suggests that the State Human
Rights Law also contains such a requirement.  This Court thus
follows Lucas and similar decisions in holding that both the City
and the State Human Rights Laws require Plaintiff to show
Defendants' discriminatory actions had an actual impact in New
York.

Because the Complaint does not allege any discriminatory
impact in New York, Plaintiff cannot support claims under either

the City or the State Human Rights Law.  The Complaint alleges
the following relevant facts: Plaintiff is a citizen of Idaho,
but all Defendants are New York citizens.  (Compl. ¶¶ 1-5.)  The
parties' oral agreement specified that Plaintiff would perform
the role of Golda Meir in the national tour of Golda's Balcony,
which would be staged in "various theaters across the United
States."  (Id. ¶¶ 23, 28.)  Plaintiff was not engaged to perform
in New York City, where the role of Golda was filled by another
actress (id. ¶ 13); the Complaint does not specify whether any
performances were expected to take place in New York State.
Although representatives of Defendants met with Plaintiff in New
York City (id. ¶ 25), the Complaint does not allege that any
other aspect of Plaintiff's work was to occur in New York City or
State.[15]  Even though it can reasonably be inferred from the
Complaint that Defendants' allegedly discriminatory decision to
terminate Plaintiff was made in New York City, Plaintiff has
failed to make the requisite allegation that the decision had an
impact in New York City and State.

_____

[15] Additionally, Plaintiff's brief contains new allegations, not
presented in the Complaint, that the parties contemplated future
performance of the contract in New York City: rehearsals, costume
fittings, and tapings of commercials.  (Pl.'s Mem. of Law 21.)
Because these allegations were not properly pled, the Court may not
consider them, and it need not decide whether they would be sufficient
to preserve Plaintiff's employment discrimination claims from
dismissal.

22

**CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part.  Counts One, Three, and Four are sustained.  Counts Two, Five, Six, and Seven are dismissed.

SO ORDERED.

Dated:     New York, New York
           March **6**, 2007

                                    _____
                                         Kimba M. Wood
                                    United States District Judge

23