UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
ANNA PEARCE, professionally known as
Patty Duke

               Plaintiff,

-against-

MANHATTAN ENSEMBLE THEATER, INC.,       06 CV 1535 (KMW)
GOLDA TOUR I, L.P., DAVID              OPINION & ORDER
FISHELSON, and FISCHELSON
PRODUCTIONS,

               Defendants.
----------------------------------------x
WOOD, U.S.D.J.:

On February 24, 2006, Plaintiff Anna Pearce ("Plaintiff") brought this action against Defendants, a theater producer and three theater production companies, alleging seven state law causes of action. In 2006, the Court dismissed all of Plaintiff's claims except her claims for breach of contract, promissory estoppel, and invasion of privacy.

Plaintiff alleges: (1) that she had an oral contract with Defendants to star in Defendants' production of the play <u>Golda's Balcony</u>, which Defendants breached by firing her (a claim for breach of contract); (2) that Defendants promised to engage Plaintiff to star in the production and that Plaintiff detrimentally relied on that promise (a claim for promissory estoppel); and (3) that Defendants used Plaintiff's name and image in materials promoting the production without her consent

(a claim for invasion of privacy).  Defendants move for summary judgment on these claims.

For the reasons stated below, the Court DENIES Defendants' motion for summary judgment on Plaintiff's breach of contract and promissory estoppel claims.  The Court GRANTS Defendants' motion for summary judgment on Plaintiff's invasion of privacy claim.

I.  Background

Unless otherwise noted, the following facts are undisputed and are derived from parties' Local Rule 56.1 statements, affidavits, and other submissions.  The Court construes all evidence in the light most favorable to the Plaintiff and draws all reasonable inferences in the Plaintiff's favor.

A.  The Parties

1.  Plaintiff

Plaintiff Anna Pearce is an actress known professionally as Patty Duke.  Plaintiff claims that Defendants hired her to star in a national tour of the play Golda's Balcony (the "Tour").

2.  Defendants

Defendant David Fischelson ("Producer") is a theater producer.  Producer staged Golda's Balcony on Broadway, and then produced the Tour.

Defendants Fischelson Productions, Inc., Manhattan Ensemble Theater, Inc., and Golda Tour I, L.P. are companies operated by

Producer and associated with the Tour.

      3.  <u>Additional relevant parties</u>

    Mitchell K. Stubbs ("Agent") is Plaintiff's agent. He
represented Plaintiff in negotiations with Defendants over
Plaintiff's role in the Tour.

    Bernard Tansey ("Manager") was general manager of the Tour.
Manager was involved in negotiations with Agent over Plaintiff's
role in the Tour.

    Meredith Blair ("Booking Agent") was responsible for booking
theaters for the Tour.

    Laura Matalon ("Marketing Agent") was responsible for
preparing promotional materials and marketing the Tour.

    B.  <u>Facts</u>

    <u>Golda's Balcony</u> is a one-actor play about Golda Meir, the
fourth Prime Minister of Israel.  Producer staged <u>Golda's
Balcony</u> on Broadway, and then began planning the Tour.  (Def's
56.1 Stat. ¶¶ 6-7.)  In October 2004, Producer approached Agent
about engaging Plaintiff to star as Golda Meir in the Tour.
(Def's 56.1 Stat. ¶ 12.)

      2.  <u>The December 24, 2004 Deal Memo</u>

    On December 23, 2004, Agent, Producer, and Manager discussed
possible terms for Plaintiff's engagement with the Tour.  (Def's
56.1 Stat. ¶ 24.)  On December 24, 2004, Manager sent Agent a

memorandum (the "Deal Memo") summarizing the parties' discussions
to that date. (Def's 56.1 Stat. ¶ 25; Neier Decl. Exs. 16, 17.)
The Deal Memo stated that Plaintiff would be signed to an Equity
Production Contract, which is a standard contract required by the
Actor's Equity Association, an actors' union.  The Deal Memo
concluded with the line "I look forward . . . to moving this to a
contract."  (Neier Decl. Ex. 17.)

Prior to sending the Deal Memo, Producer and Manager
discussed whether they wanted Plaintiff to sign the Deal Memo.
Producer expressed a desire to obtain Plaintiff's signature to
ensure that Plaintiff was committed to the Tour. (Netburn Decl.
Ex. 2.)  Manager responded that a signature was "more formal
tha[n] is called for," and that "the [M]emo has no real binding
force . . . because the union would never back it." (Netburn
Decl. Ex. 3.)  Manager added that he would "move to contract
quickly."  (Netburn Decl. Ex. 3.)  The Deal Memo did not include
a place for Plaintiff's signature.  (Neier Decl. Ex. 17.)

Defendants claim that it was clear from the Deal Memo and
earlier discussions between the parties, that Plaintiff would not
be engaged to star in the Tour until she signed a written
contract with Defendants.  (Def's 56.1 Stat. ¶¶ 15, 20, 26.)
Plaintiff claims that she understood only that Defendants wanted
to memorialize the terms of her engagement in a written contract

4

at some point, but not that a written contract was required to bind the parties. (Pl.'s 56.1 Resp. ¶ 20.)

3.   The conference call to discuss Plaintiff's engagement

Following Agent's receipt of the Deal Memo, Agent, Producer, and Manager had a conference call to discuss the terms of Plaintiff's engagement (the "Conference Call"). (Def's 56.1 Stat. ¶ 30; Pl.'s Opp. ¶ 8).[1]  During the Conference Call, the parties discussed two points regarding Plaintiff's salary. (Def's 56.1 Stat. ¶¶ 30-31.)  Plaintiff claims that the parties reached agreement on the salary terms during the Conference Call, and that, at the end of the call, Agent said "Gentlemen, we have a deal.  We have an agreement." (Pl.'s Opp. ¶ 8.)  In his deposition, Manager denied that Agent made such a statement during the call. (Tansey Dep. 153:2-10.)  The parties dispute whether Producer stated during the Conference Call that a signed agreement would be necessary to bind the parties. (Def's 56.1 Stat. ¶ 33; Pl.'s Resp. ¶ 33.)

On December 28, 2004, Producer sent an email to two email addresses belonging to Agent. (Def's 56.1 Stat. ¶ 34.)  The

_____

[1]  Defendants claim that the Conference Call took place on December 28, 2004. (Def's 56.1 Stat. ¶ 30.)  Plaintiff claims it took place sometime between December 28, 2004 and January 4, 2005. (Pl.'s Resp. ¶ 8.)

email stated that Producer and Manager would send Agent an email
within several days, which would leave the parties "close to on
target for a pre-Jan 1 delivery of signature" by Plaintiff.
(Neier Decl. Ex. 19.)  In his deposition, Agent stated that he
never received or read Producer's email.  (Pl.'s Resp. ¶ 34.)

### 4.   Plaintiff begins preparing for the Tour

The parties did not sign a written contract during the first
week of January.  (Def's 56.1 Stat. ¶ 36.)  Nonetheless, on
January 4, 2005, Agent sent an email to his agency stating that
he had "closed" on the deal for Plaintiff to star in the Tour.
(Pl.'s 56.1 Stat. ¶ 11.)  On January 5, 2005, Agent gave
Plaintiff's contact information to Producer, and Producer spoke
directly with Plaintiff for the first time. (Pl.'s Opp. ¶ 13.)
It is generally Plaintiff's policy not to speak to a producer
until a final engagement agreement has been reached.  (Pl.'s 56.1
Stat. ¶ 12.)  In her deposition, Plaintiff stated that when she
agreed to speak with Producer, she believed the parties had
concluded a final agreement for her to star in the Tour.  (Pearce
Depo. 248:18-250:2.)

Following her conversation with Producer, Plaintiff began
memorizing her lines and gathering research materials for the
role.  (Pl.'s Resp. ¶ 15.)  Agent provided Producer with
photographs of Plaintiff for use in promotional materials.

6

(Pl.'s 56.1 Stat. ¶ 16, 19.)  Producer and Marketing Agent developed logos and subscription copy for the Tour, which contained the line "Golda's Balcony, starring Patty Duke." (Pl.'s 56.1 Stat. ¶¶ 19-21.)  Beginning on January 24, 2005, Booking Agent sent materials to theaters that would be staging the Tour, which stated "Golda's Balcony, starring Patty Duke." (Pl.'s 56.1 Stat. ¶ 22.)  On January 26, 2005, Producer sent Plaintiff a draft press release for the Tour, which stated "Patty Duke to star in Golda's Balcony."  (Netburn Decl. Ex. 77.)

In February 2005, Producer and Plaintiff discussed scheduling costume fittings and photography and commercial shoots.  (Netburn Exs. 27-29.)

> 5.  The January 20, 2005 Letter of Agreement

On January 9, 2005, Producer sent Manager an email asking: "The initialed . . . Patty deal memo is first priority still, no? I know she isn't going anywhere and we're all becoming family, but it's a prudent move, perhaps?" (Neier Ex. 20.)

On January 20, 2005, Manager sent Agent a letter of agreement ("LOA") covering the terms of Plaintiff's engagement with the Tour.  (Def's 56.1 Stat. ¶ 39.)  The accompanying cover letter stated that the LOA was a draft.  (Neier Decl. Ex. 21.) On February 7, 2005, Agent emailed Manager to say that he had received the LOA and would study it.  (Def's 56.1 Stat. ¶ 54.)

7

The LOA was six single-spaced pages, contained 19 clauses, including a merger clause[2], and concluded with a signature block. (Neier Decl. Ex. 21.)  The parties had not previously discussed some provisions in the LOA.  (Def's 56.1 Stat. ¶ 42.)  Defendants claim that after receiving the draft, Agent tried to renegotiate the LOA's merchandising provision, which provided that Plaintiff would not receive royalties from the sale of merchandise that bore her likeness.  (Def's 56.1 Stat. ¶ 56.)  On February 11, 2009, Manager noted in an email that Agent had requested a change in the merchandising provision, and that Manager had agreed to give Plaintiff a ten percent royalty.  (Neier Decl. 28.)

Plaintiff contends that all material terms in the LOA had been agreed, and that Agent did not seek to renegotiate any terms.  (Pl.'s Resp. ¶ 56.; Stubb's Depo. 108:14-121:24.)  In his deposition, Agent stated that he did not recall asking for a change in the merchandising provision.  (Stubbs' Depo. 119:7-10.) Agent did recall telling Manager that the draft looked "exactly [like] what [the parties] discussed."

In early March, the parties had still not signed a written

---

[2]   The merger clause stated: "This Agreement constitutes the entire understanding and agreement between the parties hereto and supersedes all prior agreements between the parties hereto relating to the subject matter hereof.  This Agreement may not be amended or modified except in writing signed by both parties." (Neier Decl. Ex. 21.)

agreement.

> 6.  <u>Parties' expert witnesses on the use of oral
> contracts in the theater industry</u>

Plaintiff offers the affidavit of an expert witness who
states that it is general practice in the theater industry for a
producer and an actor to reach a binding oral engagement
agreement before they sign the standard Equity Production
Contract required by the actor's union, because waiting for a
signed agreement would delay preparing for and promoting the
production.  (Netburn Decl. Ex. 33.)  Plaintiff's expert witness
states that separate agreements between a producer and actor
cannot replace the Equity Production Contract, although a rider
is sometimes attached to the Contract, detailing the specific
terms of the star's engagement. (Netburn Decl. Ex. 33.)

Defendants offer the affidavit of an expert witness who
states that, in the theater industry, a signed written contract
is often required to create a binding agreement for an actor to
star in a production.  (July 18 Neier Decl. Ex. 5.)  According to
Defendant's expert witness, it is particularly likely that a
written contract would be required for a one-actor play like
<u>Golda's Balcony</u>, because the success of the show depends on the
star, and the producer would want to be confident that the actor
was committed to participating.  (July 18 Neier Decl. Ex. 5.)

7.  Producer's decision not to engage Plaintiff

In January 2005, Plaintiff was supposed to appear on an episode of Law & Order: SVU. (Def's 56.1 Stat. ¶ 47.)  On the set, Plaintiff was unable to deliver her lines and was fired from the show.  (Def's 56.1 Stat. ¶¶ 48-49.)

On February 24, 2005, Producer had a telephone conversation with Plaintiff during which Producer mentioned that he was concerned about Plaintiff's ability to perform on the Tour, given the Law & Order incident.  (Def's 56.1 Stat. ¶ 60.)  Later that evening, Producer sent Plaintiff an email stating: "I hope I didn't put too much pressure on you . . . you're my Golda, I'm certain you'll be ready to play her . . . ."  (Netburn Ex. 56.)

In the first half of March 2005, Defendants' lawyer contacted Agent to say that Producer would not engage Plaintiff to star in the Tour.  (Pl.'s Resp. ¶ 63.)

8.  Use of Plaintiff's name and image to market the Tour

In October 2004, Plaintiff gave Producer permission to tell Booking Agent that the parties were in "active negotiations" for Plaintiff to star in the Tour.  (Def's 56.1 Stat. ¶ 14.)  From that time on, Booking Agent told theaters that Plaintiff was "confirmed" as the star, in order to help book venues.  (July 18 Neier Decl. Exs. 3 & 4.)  The Booking Agent communicated only

with theaters located outside of New York. (Def's 56.1 Stat. ¶¶ 78-80.)

On January 24, 2005, Booking Agent issued deal memos to seven theaters, which confirmed the terms of their agreement to stage the Tour.[3]  (Def's 56.1 Stat. 79.)  The deal memos contained the line "Golda's Balcony, starring Patty Duke." (Def's 56.1 Stat. 80.)

In late January 2005, Producer posted on the Tour's website promotional materials that used Plaintiff's name and likeness. (Def's 56.1 Stat. ¶ 75.)  The materials were intended for theaters staging the Tour.  (Def's 56.1 Stat. ¶ 76.)

C.  Procedural History

Plaintiff brought this action on February 24, 2006, alleging seven claims against Defendants.  On April 28, 2006, Defendants moved to dismiss all of Plaintiff's claims.  On March 6, 2007, the Court granted Defendants' motion to dismiss all of Plaintiff's claims except Plaintiff's claims for breach of contract, promissory estoppel, and invasion of privacy in violation of § 51 of the New York Civil Rights Law.  These claims proceeded through discovery.

In March 2008, Defendants asserted their intention to file a

---

[3]  On March 8, 2005, Booking Agent sent a "deal memo" to an additional theater in St. Louis, Missouri.

motion for summary judgment, and the parties submitted Local Rule
56.1 Statements.  After reviewing the parties' Statements, the
Court permitted Defendants to file a motion for summary judgment.
This motion followed.

II.   <u>Analysis</u>

   A.   <u>Summary Judgment Standard</u>

   Summary judgment is appropriate only if the pleadings,
affidavits, and disclosures that form the record establish that
there is no "genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c).  Summary judgment should be denied "if the evidence is
such that a reasonable jury could return a verdict" in favor of
the non-moving party.  <u>NetJets Aviation, Inc. v. LHC Commc'ns,</u>
<u>LLC</u>, 537 F.3d 168, 178-79 (2d Cir. 2008).  In deciding a motion
for summary judgment, the Court must construe the evidence in the
light most favorable to the non-moving party and must draw all
reasonable inferences in the non-moving party's favor.  <u>In re</u>
<u>"Agent Orange" Prod. Liab. Litig.</u>, 517 F.3d 76, 87 (2d Cir.
2008).  The non-moving party cannot, however, "escape summary
judgment merely by vaguely asserting the existence of some
unspecified disputed material facts, or defeat the motion through
mere speculation or conjecture."  <u>W. World Ins. Co. v. Stack Oil,</u>
<u>Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and

quotations omitted).

In deciding a motion for summary judgment, the role of the Court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Because the Court's role is limited in this respect, the Court may not make factual findings, determine credibility of witnesses, or weigh evidence.  See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

B.   Breach of Contract

The Court finds that there are disputed issues of material fact concerning whether the parties reached a binding oral agreement for Plaintiff to star in the Tour.  Accordingly, the Court DENIES Defendant's motion for summary judgment on Plaintiff's breach of contract claim.

1.   Legal Standard

Under New York law, parties are free to enter into oral contracts.  R.G. Group, Inc. V. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984).  Parties who intend to be bound by an oral agreement are so bound even if they contemplate memorializing

their agreement in writing at some point.  Id.  If, however,
either party communicates an intent not to be bound until a
written contract is executed, then "no amount of negotiation or
oral agreement . . . will result in the formation of a binding
contract."  Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80
(2d Cir. 1985).

The Second Circuit has articulated four factors that a court
may use to help determine whether parties intended to be bound
only by a written agreement: (1) whether there has been an
express statement that a written contract is required to bind the
parties; (2) whether there has been partial performance of the
contract; (3) whether all of the terms of the alleged contract
have been agreed upon; and (4) whether the agreement at issue is
the type of contract that is usually committed to writing.  Id.

Whether parties intended to be bound only by written
contract is a question of fact that is usually best determined by
a jury at trial; it is rarely appropriate for a court to resolve
the issue on summary judgment.  See Consarc Corp. v. Marine
Midland Bank, N.A., 996 F.2d 568, 576 (2d Cir. 1992); Mgmt.
Recruiters of Boulder v. Nat'l Econ. Research Assoc., Inc., No.
02 Civ. 3507, 2005 WL 77059 (S.D.N.Y. Jan. 13, 2005).

    2.  Application

Plaintiff claims that the parties reached a binding oral

14

agreement for Plaintiff to star in the Tour during the Conference Call.  Defendants argue that the parties did not enter into a binding oral agreement, because Defendants did not intend to be bound until they signed a written contract with Plaintiff.  The Court concludes that issues of material fact exist as to whether the parties intended to be bound only by a written agreement.

> a.  <u>Express statement that a written contract is required</u>

The parties dispute whether Defendants expressly stated that Plaintiff had to sign a written contract in order to be officially engaged to star in the Tour.

Defendants point to several undisputed facts that they claim clearly indicated to Plaintiff that a written contract was required: (1) Producer's December 28, 2008 emails to Agent, which referenced a "pre-Jan 1 delivery of signature"; (2) Manager's statement in the Deal Memo that he "look[ed] forward to moving [the agreement] to contract quickly"; and (3) the existence of a draft LOA with a merger clause and signature lines.

Although these facts are strong indications that the Defendants intended to have a written contract with Plaintiff, they do not constitute express statements that the parties would

15

only be bound by a written agreement.[4]  Indeed, it would be
reasonable to interpret these facts to mean only that Defendants
intended to enter into a written agreement at some point.  This
interpretation is particularly plausible in light of the
statements of Plaintiff's expert witness that actors and
producers usually enter into a binding oral commitment and then

---

[4] The Deal Memo expressly stated that Plaintiff would be
signed to an Equity Production Contract.  It would be reasonable
to interpret Manager's final line as referring to that contract,
which, according to Plaintiff's expert witness, is often signed
well after an oral agreement is reached.

Defendants point to several cases in which courts have found
that draft agreements and merger clauses indicate an intent to be
bound only by a written agreement.  Ciaramella v. Reader's Digest
Ass'n., Inc., 131 F.3d 320 (2d Cir. 1997); Chromalloy Am. Corp.
v. Universal Housing Sys. of Am., Inc., 495 F. Supp. 544, 550
(S.D.N.Y. 1980); Grupo Sistemas Integrales De Telecomunicacion de
C.V. v. AT&T Commc'ns, Inc., No. 92 Civ. 7862, 1994 WL 463014, at
*3 (S.D.N.Y. Aug. 24, 1994) [hereinafter Grupo Sistemas].  The
facts of those cases, however, differ significantly from those at
issue here.  Ciaramella, 131 F.3d at 324 (finding that parties
did not intend to be bound by oral agreement where they exchanged
drafts of a contract that contained a merger clause and a clause
stating that the agreement would not be effective until signed by
the parties); Chromalloy, 495 F. Supp. at 550 (finding that
parties did not intend to be bound by oral agreement where they
conducted extended and intense negotiations over several drafts
of an agreement and exchanged correspondence expressly stating
that they did not intend to be bound without a written
agreement); Grupo Sistemas, 1994 WL 463014 at *1-2 (finding that
parties did not intend to be bound by oral agreement where
parties reached a deal by phone, but Plaintiff then quickly sent
Defendant a draft written agreement for signature and Defendant
called Plaintiff back immediately after receiving the agreement
with questions about several terms).

execute a written contract.[5]

### b.  Partial performance of the contract

In early January 2005, both Plaintiff and Defendants began limited performance of the contract.  Plaintiff began learning her lines and conducting research.  Producer and Marketing Agent created and distributed promotional materials using Plaintiff's name and likeness.  Plaintiff and Producer spoke for the first time about the Tour; it is undisputed that Plaintiff does not normally speak to a producer until a final agreement has been reached.  Plaintiff and Producer subsequently communicated about the Tour and Plaintiff's preparations, and began scheduling costume fittings and promotional photo shoots.  It would be reasonable for a jury to find that the parties' partial performance indicates that they reached an oral agreement in late December or early January.

------

[5]  In addition, several emails between Producer and Manager cast doubt on whether the facts enumerated above clearly indicate that Defendants intended to be bound only by a written contract. In late December, Manager indicated that a written agreement between the parties, other than the Equity Production Contract, would not be binding.  In early January, Producer stated in an email to Manager that a signed agreement was "perhaps" "a prudent move," although the parties were "all becoming family" and Plaintiff was not "going anywhere."  It would be reasonable to interpret this statement to mean that Producer was comfortable with Plaintiff's commitment to the Tour, and did not believe that a written contract was necessary.

c. Agreement on all terms of contract

There is documentary evidence that in early February the parties were still negotiating the LOA's merchandising provision. The parties dispute whether the merchandising provision was a material term of the contract, however, and it appears that the parties quickly agreed to a revision of the clause.  Plaintiff's expert witness stated that producers and actors often continue "ironing out" non-material issues after reaching a binding oral commitment.[6]  If the merchandising clause was not material and Plaintiff's witness is correct about the conventions of the theater industry, then it would be reasonable to find that the parties had entered into a binding oral agreement, even though they were still discussing certain provisions of the LOA.

d.  Type of contract normally committed to writing

The parties offer competing expert testimony on whether, in the theater industry, a written contract normally is required to create a binding engagement agreement between an actor and producer.  The Court cannot determine the credibility of the

---

[6] Defendants cite several decisions in which Courts have found that on-going negotiations on contractual terms preclude a finding that the parties reached a binding oral agreement. Ciramella, 131 F.3d at 325; Winston, 777 F.2d at 82-83.  In these cases, however, the parties were still in negotiations over undisputedly material terms of the contract, and failure to resolve those terms had prevented the parties from signing the agreements.

parties' witnesses on summary judgment.  Therefore, whether the parties' agreement is the type normally committed to writing is a disputed issue of material fact.

Based on the absence of an express statement that Defendants required a written contract, the parties' partial performance of the contract, and the conflicting expert testimony, a reasonable jury could find that the parties did not intend to be bound only by a written contract.  The Court thus cannot conclude as a matter of law that there was no binding oral agreement between the parties.  Accordingly, the Court DENIES Defendant's motion for summary judgment on Plaintiff's breach of contract claim.

C.   Promissory Estoppel

The Court concludes that there are disputed issues of material fact on Plaintiff's promissory estoppel claim.  The Court DENIES Defendant's motion for summary judgment on Plaintiff's promissory estoppel claim.

1.   Legal Standard

To establish a cause of action for promissory estoppel under New York law, a plaintiff must prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on the promise; and (3) injury as a result of the reliance.  R.G. Group, 751 F.2d at 78.  Courts have found that there cannot be a clear and unambiguous promise where parties intended to be bound

only by written agreement.  Id. at 78-79.

   2.  Application

Plaintiff claims that she relied on a clear promise by
Defendants to engage her for the Tour, and suffered financial and
reputational damage when Defendants fired her.  Defendants move
for summary judgment on the grounds that: (1) the parties
intended to be bound only by a written agreement; and (2)
Plaintiff has not shown that she detrimentally relied on
Defendants' alleged promise.

Defendants' first argument fails because the Court has
already determined that it is unclear whether the parties
intended to be bound only by a written agreement.

Defendants' second argument also fails.  Plaintiff claims
that she suffered financial damage as a result of her reliance on
Defendants' alleged promise, because she abandoned efforts to be
cast on a television series so that she could prepare for and
star in the Tour.  (Stubbs Depo. 95:1-5.) Plaintiff also claims
that she suffered reputational damage by being fired from a
production with which she had been publicly associated.  A jury
thus could conclude that Plaintiff detrimentally relied on
Defendants' alleged promise.

Plaintiff, therefore, has raised triable issues of fact on
her promissory estoppel claim.  The Court DENIES Defendants'

motion for summary judgment on that claim.

D.   <u>Invasion of Privacy</u>

The Court concludes that Plaintiff has not identified any facts that support her claim for invasion of privacy in violation of Section 51 of the New York Civil Rights Law ("NYCRL § 51"). The Court GRANTS Defendant's motion for summary judgment on Plaintiff's invasion of privacy claim.

1.   <u>Legal Standard</u>

NYCRL § 51 makes it illegal to use an individual's name, picture, or voice "within [New York]" for advertising or trade purposes, without that individual's written consent.  N.Y. Civ. Rights Law § 51 (McKinney 2009); <u>see also</u> <u>Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GMBH & Co.</u>, 150 F. Supp. 2d 566, 574-75 (S.D.N.Y. 2001).  The law is intended to protect an individual's privacy by preventing the unauthorized commercial exploitation of her personality.  <u>See</u> <u>Gautier v. Pro-Football, Inc.</u>, 304 N.Y. 354, 358 (N.Y. 1952) (stating that purpose of NYCRL § 51 "was born of the need to protect the individual from selfish, commercial exploitation of his personality").  NYCRL § 51 allows a claim only in the event that there has been an unauthorized use of an individual's name or image "within New York."  <u>Cuccioli</u>, 150 F. Supp. 2d at 575.

2.  Application

Plaintiff claims that Defendants violated her right to privacy under NYCRL § 51 by using her name and image in promotional materials posted on the Tour's website, and in deal memos sent to theaters staging the Tour.  Defendants argue that they did not violate NYCRL § 51, because Defendants did not use Plaintiff's name and image "within" New York.[7]  The Court agrees with Defendants.

It is undisputed that the deal memos and website were intended for and used by theaters only outside of New York. Plaintiff nonetheless argues that Defendant's use of her name and image occurred "within the state," because Defendants and their agents were located in New York when they created the materials

_____

[7]  Defendants also argue that Plaintiff's claim under NYCRL § 51 is time-barred.  NYCRL § 51 is subject to the one-year statute of limitations period set forth in N.Y. C.P.L.R. 215(3) (McKinney 2009).  The statute of limitations begins to run the first time an offending item is published or distributed, but the limitations period is refreshed if an item is "republished." Rinaldi v. Viking Penguin, Inc., 422 N.Y.S.2d 552 (N.Y. Sup. Ct. 1979).  Republication occurs when a subsequent publication: (1) is intended for and reaches a new audience, or (2) materially changes or modifies the original.  See Firth v. State, 747 N.Y.S.2d 69, 72 (2002); Zoll v. Jordache Enters. Inc., 01 Civ. 1339, 2002 WL 31873461 (S.D.N.Y. Dec. 24, 2002).  Defendants sent deal memos to seven theaters on January 17, 2005.  On March 8, 2005, Defendants sent a deal memo to a new theater in St. Louis, Missouri.  This constitutes republication because the memo was intended to and did reach a new audience.  Therefore, Plaintiff at least has a claim under NYCRL § 51 based on the March 8, 2005 deal memo.

and memos, and because the website was accessible within New York.  As set forth below, the Court holds that Defendants' use of Plaintiff's name and image does not constitute use "within the state" for the purposes of NYCRL § 51.

When deciding whether a plaintiff has a claim under NYCRL § 51, most courts look at whether a plaintiff's name or image was used on a product for sale in New York, or on advertising materials distributed in New York.  See, e.g., Cuccioli, 150 F. Supp. 2d at 574-76 (finding that plaintiff did not have a claim under NYCRL § 51 where plaintiff's image was used on a CD produced by a German recording company and marketed to and intended for audiences in Germany); Allen v. Nat'l Video, Inc., 610 F. Supp. 612, 622 n.4 (S.D.N.Y. 1985) (finding that defendants' use of plaintiff's image occurred within New York where defendants used a photograph of plaintiff in an advertising campaign that "was actually and foreseeably distributed in [New York]").  Plaintiff cites no case in which a court has permitted a claim under NYCRL § 51, where the only "use" of the plaintiff's name or image within New York, was the creation of materials that were only intended for and distributed to an audience outside of New York.  The Court declines to extend the law to cover such claims.

The purpose of NYCRL § 51 is to protect an individual's

23

privacy by preventing commercial exploitation of her name and image.  See Cuccioli, 150 F. Supp. 2d at 575 (holding that NYCRL § 51 only creates a claim for "one whose likeness has been used for prohibited purposes within [New York]").  It is the actual unauthorized public use of an individual's name or image that exploits the individual and invades her privacy, not the mere creation of unauthorized promotional materials.  NYCRL § 51 only protects against such use to the extent that it takes place within New York.  Where an individual's name and image has been used publicly only outside of New York, the individual has not been subject to commercial exploitation within New York, and therefore does not have a claim under NYCRL § 51.

The deal memos and promotional materials were solely intended for and distributed to theaters outside of New York.[8] Plaintiff thus does not have a claim under NYCRL § 51.[9]

---

[8]   Plaintiff also argues that she has a claim under NYCRL § 51 based on announcements in March 2005 by two out-of-state theaters that they would stage "Golda's Balcony, starring Patty Duke."  These announcements clearly took place outside of New York and were directed at audiences outside of New York; they do not give rise to a claim under NYCRL § 51.

[9]  The fact that Defendants' website may have been accessible to individuals in New York does not alter the Court's conclusion.  The mere accessibility of a website within New York does not give rise to a claim under NYCRL § 51, where there is no evidence that the website was marketed or used in New York.  See Cuccioli, 150 F. Supp. 2d at 576 (holding that accessibility of German website in New York did not constitute use of the website within New York, where website was not intended for New Yorkers).

24

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's invasion of privacy claim.

VI.   <u>Conclusion</u>

For the reasons stated above, the Court DENIES Defendants' motion for summary judgement on Plaintiff's breach of contract and promissory estoppel claim.  The Court GRANTS Defendants' motion for summary judgment on Plaintiff's invasion of privacy claim.

No later than October 14, 2009, the parties shall submit a joint pre-trial order.  The pre-trial order must conform to the Court's Individual Practices, a copy of which may be obtained at http://www1.nysd.uscourts.gov/cases/show.php?db=judge_info&id=427. The pre-trial order also must contain a one-page joint statement of the nature of the case to be read to prospective jurors by the Court at voir dire.

Any motions in limine shall be submitted with the pre-trial order, no later than October 14, 2009.

No later than October 19, 2009, the parties shall submit responses to any motions in limine.  No later than October 22, 2009, the parties shall submit any replies to the responses.

This case is set for pre-trial conference on October 19, 2009, at 9:00 a.m.

This case is deemed ready trial as of October 14, 2009.  At

any time after the Ready Trial Date, the Court may call the parties to trial upon forty-eight hours notice.  No adjournment of that trial date will be permitted, unless counsel has faxed to chambers an <u>affidavit</u> stating that he or she is engaged in trial in another court.  This affidavit shall include: (1) the caption of the other case, including its index number; (2) the expected length of the trial; (3) the court in which the other case is to be tried; and (4) the name and telephone number of the judge presiding over the case.  Counsel shall notify the Court and all other counsel in writing, at the earliest possible time, of any particular scheduling problems involving out-of-town witnesses or other exigencies.

SO ORDERED

Dated:    New York, New York
          September 27, 2008

_____
                Kimba M. Wood
         United States District Judge

26